**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **HOWARD G. DIAMOND, #27213-078** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:20cv397** |
| | § | **CRIMINAL ACTION NO. 4:17cr118(1)** |
| **UNITED STATES OF AMERICA** | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Movant Howard G. Diamond, with the assistance of counsel,[1] filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, asserting violations concerning his Eastern District of Texas, Sherman Division conviction. The motion was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case pursuant to 28 U.S.C. § 636, and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to the United States Magistrate Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

Movant was a physician, who owned and operated Diamondback Pain and Wellness Center ("Diamondback") from 2012 to 2017. Movant practiced pain management in both Grayson County and Lamar County, Texas, with clinics in Sherman and Paris, Texas.

On July 25, 2014, T.H.'s family drove from Texas to Oklahoma to visit T.H. and other family members. When they arrived at T.H.'s home, they found her asleep in the back seat of her car, but she would not wake up. A family member rolled down the windows to the vehicle and

---

[1] Movant filed *pro se* the operative § 2255 amended motion (Dkt. #22); however, counsel subsequently entered a notice of appearance on behalf of Movant and filed a supplemental memorandum in support of the amended motion. (Dkt. #49).

[2] The factual background is taken from the Presentence Report. Crim. ECF (Dkt. #89).

went inside the residence. When someone went outside to check on T.H. after a few hours, they found her unresponsive. Emergency services was called, and T.H., age thirty-nine, was transported to Canadian Valley Hospital in Yukon, Oklahoma, where she was pronounced dead.

On August 19, 2014, T.H.'s family members reported to DEA agents that T.H. had died from a drug overdose on July 25, 2014, after taking oxycodone, morphine, alprazolam, and Ambien, which had all been prescribed by Movant. T.H.'s family reported that she was not known to suffer from any medical condition that would have necessitated the use of the prescriptions that were written for her. The following day, DEA agents went to Integris Canadian Valley Hospital where they met with pharmacist Jason Baird ("Baird"). Baird provided the agents with six prescription bottles from Sam's Pharmacy in Sherman, Texas, that were issued in T.H.'s name. Baird counted the tablets and identified each tablet for the agents. The prescriptions consisted of 60 morphine 60mg tablets, 30 zolpidem 10mg tablets, 90 gabapentin 300mg tablets, 120 alprazolam 1mg tablets, 1 yellow pill believed to be acetaminophen/butalbital 300/50mg, and 60 promethazine 25mg tablets. DEA agents also seized a bottle labeled oxycodone 30mg, quantity 50, for T.H. that had not yet been filled.

On August 27, 2014, a subpoena was served at Sam's Pharmacy to obtain the records pertaining to T.H.'s prescriptions. The records showed that the prescriptions, outlined in the previous paragraph, were issued by Movant for T.H. The records confirmed that T.H. filled the prescriptions on July 15, 2014. According to the Oklahoma Medical Examiner's Office, T.H. died from morphine toxicity on July 25, 2014. At the time of her death T.H.'s prescriptions included 120 oxycodone 30mg tablets and 60 morphine 60mg pills. The prescriptions were filled on July 15, 2014. On July 25, 2014, the date of T.H.'s death, there were no oxycodone tablets remaining and only thirty-two morphine pills remaining.

A review of the Texas Department of Public Safety, Texas Prescription Monitoring Program ("PMP"), confirmed that T.H. was a patient of Movant and that Movant issued T.H. prescriptions for oxycodone, morphine, alprazolam, and Ambien. PMP did not show that T.H. received prescriptions from any other providers during the eight months leading up to her death.

Investigation by the DEA revealed that records from the U.S. Department of Health and Human Services showed that Movant had twenty patients die in 2011; twenty-eight patients died in 2012; and thirty-two patients died in 2013. Texas PMP records show that between December 2014 and December 2015, Movant prescribed 1,082,781 dosage units of hydrocodone and 283,698 dosage units of oxycodone. According to the government, there is no evidence to show that all of the prescriptions issued by Movant were written without medical cause.

DEA agents identified more than nineteen pharmacies where Movant's patients filled prescriptions he had issued them. The pharmacies were located in both Texas and Oklahoma. During the investigation into the overdose deaths, agents interviewed several pharmacists who filled prescriptions for Movant's patients. Several of the pharmacists indicated that they had concerns about the number of individuals who obtained controlled substance prescriptions from Movant and that their attempts to contact Movant about their concerns were unsuccessful. The pharmacists had concerns about Movant prescribing multiple controlled substances for an individual patient.

In addition, between September 2015 and April 2017, Movant unlawfully obtained money from Medicare by submitting fraudulent claims representing that he provided patient care when in fact he did not provide the services reflected on the claims submitted. Specifically, Movant submitted a Medicare claim in the amount of $117.00 for an office visit in which he represented that he provided medical services on September 29, 2015. The government located travel/airline

documentation which showed that Movant could not have provided medical services on that date as he had traveled from Dallas, Texas, to Boston, Massachusetts, on September 28, 2015, and returned October 4, 2015.

Additional fraudulent claims submitted by Movant include fees totaling $751.00 during the month of July 2016. On the dates in which Movant claimed he provided medical services he was actually traveling between Dallas and Massachusetts and Dallas and California. During the month of March 2017, Movant billed Medicare for various services totaling $2,271, on dates in which he was in Orlando, Florida. The aforementioned Medicare fees were paid to Movant based on claims representing that the patients were treated by him when in fact the patients were treated by a nurse practitioner or not treated at all. As a result, Movant caused the Medicare Program to suffer an actual loss of $3,139.

On July 6, 2017, a grand jury sitting in the Eastern District of Texas, Sherman Division, returned a twenty-one-count Indictment against Movant. Crim. ECF (Dkt. #1). Count One of the Indictment charged Movant with conspiracy to possess with the intent to distribute and dispense and distributing and dispensing controlled substances resulting in death, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Count Nine charged Movant with health care fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1347 and 2. A First Superseding Indictment and a Second Superseding Indictment extended the dates for the charged offenses. Crim. ECF (Dkt. ##38, 61).

On October 5, 2018, Movant entered a plea of guilty to Counts One and Nine of the Second Superseding Indictment pursuant to a written plea agreement. Crim. ECF (Dkt. ##78, 80). In the plea agreement, Movant agreed to a sentence of twenty years' imprisonment on Count One and ten years' imprisonment on Count Nine, with the sentences to run concurrently, pursuant to Fed.

R. Crim. P. 11(c)(1)(C). Crim. ECF (Dkt. #80, p. 3, ¶ 4). The plea agreement contained the following waiver provision:

> Except as otherwise provided in this paragraph, the defendant waives the right to appeal the conviction, sentence, fine, order of restitution, or order of forfeiture in this case on all grounds. The defendant further agrees not to contest the conviction, sentence, fine, order of restitution, or order of forfeiture in any post-conviction proceeding, including, but not limited to, a proceeding under 28 U.S.C. § 2255. The defendant, however, reserves the right to appeal the failure of the Court, after accepting this agreement, to impose a sentence in accordance with the terms of this agreement. The defendant also reserves the right to appeal or seek collateral review of a claim of ineffective assistance of counsel.

Crim. ECF (Dkt. #80, p. 8, ¶ 10).

On May 9, 2019, United States District Judge Marcia A. Crone sentenced Movant to 240 months' imprisonment on Count One and 120 months' imprisonment on Count Nine, the sentences to be served concurrently. Crim. ECF (Dkt. ##92, 94). Movant filed a notice of appeal, which the Fifth Circuit Court of Appeals dismissed pursuant to Movant's motion. Crim. ECF (Dkt. ##108, 113).

Movant filed his original § 2255 motion (Dkt. #1) on May 5, 2020, and the operative amended § 2255 motion (Dkt. #22) on February 4, 2021. Movant asserts that he is entitled to relief based on ineffective assistance of counsel, which rendered his guilty plea unknowing and involuntary, and because the government failed to turn over exculpatory evidence and committed prosecutorial misconduct, and because 21 U.S.C. § 846 is unconstitutionally vague. In support of the amended motion, Movant filed a *pro se* memorandum. (Dkt. #26). The government filed a response (Dkt. #35), asserting Movant's ineffective assistance of counsel claims are without merit and his remaining claims barred by the appeal waiver in the plea agreement. At the request of the government, counsel for Movant during the plea proceedings, Peter Schulte ("Counsel"), provided an affidavit in response to Movant's ineffective assistance of counsel claims. (Dkt. #35-1).

Thereafter, Movant's retained counsel filed a supplemental memorandum in support of the § 2255 amended motion.[3] (Dkt. #49).

## II. STANDARD FOR FEDERAL HABEAS CORPUS PROCEEDINGS

As a preliminary matter, it should be noted that a § 2255 motion is "fundamentally different from a direct appeal." *United States v. Drobny*, 955 F.2d 990, 994 (5th Cir. 1992). In a § 2255 proceeding, a movant may not bring a broad-based attack challenging the legality of the conviction. The range of claims that may be raised in a § 2255 proceeding is narrow. A "distinction must be drawn between constitutional or jurisdictional errors on the one hand, and mere errors of law on the other." *United States v. Pierce*, 959 F.2d 1297, 1300-1301 (5th Cir. 1992) (citations omitted). A collateral attack is limited to alleging errors of "constitutional or jurisdictional magnitude." *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991). Conclusory allegations, which are unsupported and unsupportable by anything else contained in the record, do not raise a constitutional issue in a habeas proceeding. *Ross v. Estelle*, 694 F.2d 1008, 1011-12 (5th Cir. 1983). The role of § 2255 has been defined by the Fifth Circuit as follows:

> Section 2255 provides relief for a petitioner who can establish that either (1) his sentence was imposed in violation of the Constitution or laws of the United States, (2) the sentencing court was without jurisdiction to impose the sentence, (3) the sentence was in excess of the maximum authorized by law, or (4) the sentence is otherwise subject to collateral attack.

*United States v. Seyfert*, 67 F.3d 544, 546 (5th Cir. 1995) (citations omitted). "Section 2255 does not reach errors of constitutional or jurisdictional magnitude that could have been reached by a direct appeal." *Id.* Similarly, "issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 motions." *United States v. Kalish*, 780 F.2d

---

[3] Pursuant to the court's Order (Dkt. #48), the court will only consider clarifications or supplements to Movant's *pro se* § 2255 amended motion; it will not consider any new issues raised by counsel in the supplement briefing.

506, 508 (5th Cir. 1986) (citing *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980)); *United States v. Goudeau*, 512 F. App'x 390, 393 (5th Cir. 2013).

### III. MOVANT'S GUILTY PLEA WAIVER

It is undisputed that Movant pled guilty pursuant to a written plea agreement. Crim. ECF (Dkt. #80). The court first examines whether Movant knowingly and voluntarily pled guilty, as informed and voluntary waivers of post-conviction relief are upheld by the Fifth Circuit. *See United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994). To determine whether a collateral-review waiver bars an appeal, a court considers "(1) whether the waiver was knowing and voluntary and (2) whether the waiver applies to the circumstances at hand, based on the plain language of the agreement." *United States v. Barnes*, 953 F.3d 383, 386 (5th Cir. 2020) (quoting *United States v. Kelly*, 915 F.3d 344, 348 (5th Cir. 2019)), *cert. denied*, 141 S. Ct. 438 (2020). "A waiver is knowing and voluntary if the defendant knows that he has the right to collateral review and that he is waiving it in the plea agreement." *Barnes*, 954 F.3d at 386 (citation omitted). "[A]n informed and voluntary waiver of post-conviction relief is effective to bar such relief" except in two circumstances: (1) an ineffective assistance of counsel claim that "directly affected the validity of that waiver or the plea itself"; or (2) when a sentence "exceeds the statutory maximum." *United States v. Hollins*, 97 F. App'x 477, 479 (5th Cir. 2004). Here, the plea agreement, change of plea hearing, factual basis, Findings of Fact and Recommendation on Guilty Plea, and Consent to Administration of Guilty Plea and Fed. R. Crim. P. 11 Allocution by United States Magistrate Judge all show that Movant knowingly and voluntarily waived his rights.

In his plea agreement, Movant waived his rights to plead not guilty, to be tried by a jury, to have his guilt proved beyond a reasonable doubt, to confront and cross-examine witnesses, to call witnesses in his defense, and to not be compelled to testify against himself. Crim. ECF (Dkt.

#80, p. 1, ¶¶ 1-2). Movant also understood the nature and the elements of the offenses to which he was pleading guilty, as well as the possible sentences he faced, including possible life imprisonment on Count One. Crim. ECF (Dkt. #80, p. 2, ¶¶ 2-3). The parties agreed Movant's sentence on Count One would be twenty years' imprisonment and that his sentence on Count Nine would be ten years' imprisonment, with the sentences to run concurrently. Crim. ECF (Dkt. #80, p. 3, ¶ 4). Movant stipulated that his guilty plea was freely and voluntary given, and not the result of force, threats, or promises other than those contained in the written plea agreement. Crim. ECF (Dkt. #80, p. 7, ¶ 9). And, as noted above, his plea agreement also included the following waiver provision:

> Except as otherwise provided in this paragraph, the defendant waives the right to appeal the conviction, sentence, fine, order of restitution, or order of forfeiture in this case on all grounds. The defendant further agrees not to contest the conviction, sentence, fine, order of restitution, or order of forfeiture in any post-conviction proceeding, including, but not limited to, a proceeding under 28 U.S.C. § 2255. The defendant, however, reserves the right to appeal the failure of the Court, after accepting this agreement, to impose a sentence in accordance with the terms of this agreement. The defendant also reserves the right to appeal or seek collateral review of a claim of ineffective assistance of counsel.

Crim. ECF (Dkt. #80, p. 8, ¶ 10). Movant also states in his plea agreement:

> The defendant has thoroughly reviewed all legal and factual aspects of this case with defense counsel and is fully satisfied with defense counsel's legal representation. The defendant has received satisfactory explanations from defense counsel concerning each paragraph of this plea agreement, each of the defendant's rights affected thereby, and the alternatives to entering a guilty plea. After conferring with counsel, the defendant concedes guilt and has concluded that it is in the defendant's best interest to enter this agreement rather than proceeding to trial.

Crim. ECF (Dkt. #80, pp. 8-9, ¶ 12). Additionally, Movant stated, "I have read or had read to me this plea agreement and have carefully reviewed every part of it with my attorney. I fully understand it and voluntarily agree to it." Crim. ECF (Dkt. #80, p. 9). Movant's signed plea

agreement shows that his guilty plea was both knowingly and voluntarily made. The court finds the waiver in Movant's plea agreement is valid and enforceable and should be upheld.

At Movant's change of plea hearing, Movant acknowledged that he understood the charges, the elements of the offenses, and the full range of penalties associated with each offense. Crim. ECF (Dkt. #84, pp. 14-16). Movant informed the court he understood the rights he was waiving by pleading guilty. Crim. ECF (Dkt. #84, pp. 6-8). Movant also informed the court that he read and understood the plea agreement before signing it. Crim. ECF (Dkt. #84, pp. 17-18). He stated he was not forced, threatened, coerced, or induced to plead guilty. Crim. ECF (Dkt. #84, pp. 24, 26). The court admonished Movant as to his waiver of rights and the rights he was reserving, and Movant stated that he understood the waiver. Crim. ECF (Dkt. #84, pp. 23-24). Movant further acknowledged that although the parties agreed to specific sentences in the plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), he understood the maximum range of penalties and consequences, and that he could be sentenced up to life imprisonment on Count One. Crim. ECF (Dkt. #84, pp. 15-16). Movant stated that he understood the district judge would sentence him, that sentencing would not occur until after the presentence report ("PSR") was prepared, and that the federal sentencing guidelines are simply discretionary. Crim. ECF (Dkt. #84, pp. 16-17). Movant stated that everything contained in the factual basis was true and correct. Crim. ECF (Dkt. #84, p. 30). Accordingly, the plea hearing also shows that Movant's guilty plea was knowing and voluntary.

The factual basis stated that Movant "distributed or dispensed morphine, oxycodone, alprazolam and zolpidem on July 15, 2014, that resulted in the death of T. H. on July 25, 2014." Crim. ECF (Dkt. #82, p. 2, ¶ 7). The factual basis further stated that Movant "knowingly and willfully executed a scheme or artifice to defraud Medicare and to obtain money or property from Medicare by means of false or fraudulent pretenses, representations, and promises" in that he

"submitted, or caused to be submitted, a claim to Medicare that falsely represented that he treated a Medicare beneficiary, identified as HICN ***0846A, on September 29, 2015, when, in truth and fact, he traveled to Boston, Massachusetts during this alleged date of service and did not treat the Medicare beneficiary identified above." Crim. ECF (Dkt. #82, p. 2, ¶ 8). In the Findings of Fact and Recommendation on Guilty Plea, the magistrate judge concluded that Movant was fully competent and capable of entering an informed plea. Crim. ECF (Dkt. #85, p. 3). The magistrate judge found that Movant was aware of the nature of the charges and consequences of the plea; that the guilty plea was made freely, knowingly, and voluntarily; and that the guilty plea was not the result of force, threats, or promises, other than the promises contained in the plea agreement. Crim. ECF (Dkt. #85, p. 3). On October 17, 2018, the United States District Judge adopted the magistrate judge's recommendation, accepted Movant's plea, and adjudged him guilty on Count One and Count Nine of the Second Superseding Indictment. Crim. ECF (Dkt. #86). In the Consent to Administration of Guilty Plea and Fed. R. Crim. 11 Allocution by United States Magistrate Judge signed by Movant, Movant again stated he understood his trial rights, the charges against him, the statutory minimum and maximum penalties, the rights he was waiving, the terms of the plea agreement, and that the factual statement he signed is true and correct. Crim. ECF (Dkt. #79). These documents also show that Movant's guilty plea was knowing and voluntary.

In cases where the record establishes that the defendant understood the nature of the charges against him and the direct consequences of his actions, the rudimentary demands of a fair proceeding and a knowing, voluntary plea are satisfied. *James v. Cain*, 56 F.3d 662, 666 (5th Cir. 1995); *Wright v. United States*, 624 F.2d 557, 561 (5th Cir. 1980). "The critical issue in determining whether a plea was voluntary and intelligent is 'whether the defendant understood the nature and substance of the charges against him, and not necessarily whether he understood their

technical legal effect.'" *James*, 56 F.3d at 666 (quoting *Taylor v. Whitley*, 933 F.2d 325, 329 (5th Cir. 1991)). Here, Movant fails to show that he did not understand the nature of the constitutional protections that he was waiving or that he had "such an incomplete understanding of the charges against him that his plea cannot stand as an admission of guilt." *United States v. Lord*, 915 F.3d 1009, 1016 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 320 (2019) (citing *James*, 56 F.3d at 666). Formal declarations in open court carry with them a "a strong presumption of verity." *United States v. Abreo*, 30 F.3d 29, 31 (5th Cir. 1994) (citing *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)); *see also United States v. Lampaziatie*, 251 F.3d 519, 524 (5th Cir. 2001) (declaring this rule as "well established"). Similarly, "official documents—such as a written plea agreement—are 'entitled to a presumption of regularity and are accorded great evidentiary weight.'" *United States v. McDaniels*, 907 F.3d 366, 371 (5th Cir. 2018) (quoting *Hobbs v. Blackburn*, 752 F.2d 1079, 1081 (5th Cir. 1985)). Although a defendant's attestation of voluntariness at the time of the plea is not an absolute bar to later contrary contentions, it places a heavy burden upon him. *United States v. Diaz*, 733 F.2d 371, 373-74 (5th Cir. 1984) (quotations and citations omitted). If a defendant understands the nature of the charges against him and the consequences of his plea, yet voluntarily chooses to plead guilty, the plea must be upheld on federal review. *Wilkes*, 20 F.3d at 653; *Diaz v. Martin*, 718 F.2d 1372, 1376-77 (5th Cir. 1983). Here, based upon the foregoing, the court finds that Movant has failed to carry his burden and concludes that Movant's guilty plea was knowing and voluntary, and must be upheld. Accordingly, any issues not reserved for review were waived by Movant's knowing and voluntary plea agreement.

Movant claims that the government failed to turn over material exculpatory evidence, that the government committed prosecutorial misconduct, and that 21 U.S.C. § 846 is unconstitutionally vague. These claims, however, do not involve the ineffective assistance of counsel or allegations that

the district judge failed to impose a sentence in accordance with the terms of the plea agreement. As a result, these grounds for review have been waived and are not cognizable in this proceeding.

### IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Although Movant waived the right to file a § 2255 motion, his plea agreement reserved the right "to seek collateral review of a claim of ineffective assistance of counsel." Crim. ECF (Dkt. #80, p. 8, ¶ 10). In his amended motion, Movant alleges Counsel rendered constitutionally ineffective assistance in connection with the decision to plead guilty.

Although a guilty plea ordinarily waives all nonjurisdictional defects, including ineffective assistance claims, a movant may raise ineffective assistance to the extent that it affected the voluntariness of his plea. *United States v. Cavitt*, 550 F.3d 430, 441 (5th Cir. 2008). In other words, "once a guilty plea has been entered, all nonjurisdictional defects in the proceedings against a defendant are waived," and the waiver "includes all claims of ineffective assistance of counsel, except insofar as the alleged ineffectiveness relates to the voluntariness of the giving of the guilty plea." *Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983).

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction requires the defendant to show the performance was deficient and the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700. A court need not address both components if the movant makes an insufficient showing on one. *Id.* at 697. A movant who seeks to overturn his conviction on the grounds of ineffective assistance of counsel must prove his entitlement to relief by a preponderance of the evidence. *James*, 56 F.3d at 667. The standard requires the reviewing court to give great deference to counsel's performance,

strongly presuming counsel exercised reasonable professional judgment. *Strickland*, 466 U.S. at 690. The right to counsel does not require errorless counsel; instead, a criminal defendant is entitled to reasonably effective assistance. *Boyd v. Estelle*, 661 F.2d 388, 389 (5th Cir. 1981).

A movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Movant must "affirmatively prove," not just allege, prejudice. *Id.* at 693. When a movant pleads guilty, as in this case, he must also show that, but for trial counsel's alleged deficient performance, he would not have pled guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 57-59 (1985); *United States v. Glinsey*, 209 F.3d 386, 392 (5th Cir. 2000) (requiring defendant to show a reasonable probability that, but for counsel's allegedly erroneous failure, he would have insisted on trial).

The ineffective assistance of counsel claims raised in Movant's § 2255 amended motion generally relate to Counsel's failure to conduct an adequate pretrial investigation to test the strength of the government's case, including failure to interview witnesses and gather medical records. (Dkt. #22, pp. 4-5; *see also* Dkt. #26; Dkt. #49). Movant asserts that Counsel's alleged failures and deficient advice "raise[] doubt" as to whether his guilty plea was knowing and voluntary. (Dkt. #22, p. 5).

It is well-settled that trial counsel must engage in a reasonable amount of pretrial investigation, and "at a minimum, . . . interview potential witnesses and . . . make an independent investigation of the facts and circumstances of the case." *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985). However, the defense of a criminal case does not "contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). An

13

attorney is not necessarily ineffective for failing to investigate every conceivable, potentially non-frivolous matter. *Id.* Further, while an attorney's failure to investigate a witness who has been identified as crucial may indicate an inadequate investigation, the failure to investigate everyone whose name happens to be mentioned by the defendant does not suggest ineffective assistance. *United States v. Cockrell*, 720 F.2d 1423, 1428 (5th Cir. 1983). A defendant who alleges a failure to investigate must allege with specificity what the investigation would have revealed, and how it would have altered the outcome of the trial. *Gray v. Lucas*, 677 F.2d 1086, 1093 (5th Cir. 1982).

Complaints about the failure to call witnesses are disfavored on collateral review because allegations of potential testimony are largely speculative, and the presentation of witnesses is generally a matter of trial strategy. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986). A movant must identify the witness, explain the content of the witness's proposed testimony, show the testimony would have been favorable to a particular defense, and demonstrate that the witness would have testified at trial. *Day*, 566 F.3d at 538; *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Where "the only evidence of a missing witness's testimony is from the defendant," claims of ineffective assistance are viewed with great caution. *Cockrell*, 720 F.2d at 1427.

Counsel responded to Movant's allegations of ineffective assistance in an affidavit filed in support of the government's response. (Dkt. #35-1). Counsel provides a general background of his pretrial investigation and the evidence discovered and the resulting plea negotiations:

> 10.    I learned early in the representation of the Defendant that the Defendant, who operated a "pain management clinic" in Sherman, Texas, had a difficult time "keeping up with medical records" for visits with his patients. The information received was that the Defendant's ADHD condition is what caused him to not be able [] keep up with the "documentation" aspect of his practice.

11.    During that time, I also discovered that on August 28, 2015 the Defendant had entered into a "Non-Disciplinary Remedial Plan" with the Texas Medical Board (TMB) that required the Defendant to complete at least eight hours of [Continuing Medical Education] in Medical Recordkeeping. The Texas Medical Board found that "although Dr. Diamond's prescribing was appropriate and his rationale was well-considered, he failed to maintain adequate medical records documenting his care and treatment of chronic pain patients." This information corroborated what had been reported to me previously.

12.    Upon review of the Discovery received from the Government in 2017, it became clear to me that complete medical records from the Defendant for the 7 patients that had died did not exist in the Discovery. When I approached the Defendant about this major issue, it is true that he acknowledged that he had changed "electronic medical records (EMR)" providers three times during 2010-2017 in a meeting shortly after the detention hearing. I asked the Defendant why historical medical records were not merged/transferred over to each subsequent new system and he acknowledged not complying with his contractual obligations with the previous EMR provider(s). I know that many EMR providers will not release medical records to providers who do not pay for their services. I explained early in the case to the Defendant that not maintaining current and accurate medical records would be a serious hindrance to his defense in this case.

13.    The Defendant believed that I could issue a subpoena to his prior EMR providers and have his medical records produced. While attempting to locate the current locations of the prior EMR providers, I found that the EMR providers had either gone out of business or merged with other EMR providers. The Defendant also believed a single "hard drive" existed from the "Catalis" system that was used from 2010-2012. The Defendant was not sure where this "hard drive" was at that time in 2017.

14.    I was able to subpoena records from the "Aprima" EMR system and received 4,429 patient records from "Aprima" in late 2017. By February 2018, we had all medical records that existed in both the "Aprima" system and the "Athena" system but had not been able to locate the missing "hard drive" for the "Catalis" system. Records received from the "Aprima" system contained health records for [] (T.H.) for dates of service by the Defendant's office on 5/13/2013, 8/23/2013, 10/18/2013, 12/12/2013, and 7/15/2014, the last visit before her death (death occurred on 7/25/2014).

15.    In late 2017, I was able to provide a complete copy of the Discovery received from the Government, along with the records I had received via subpoena, on a portable hard drive to the Defendant at the Collin County jail. I worked out an agreement with the Collin County Sheriff's Office to

allow the Defendant access to the law library for several hours a week to review the Discovery on the hard drive.

16.     I kept a copy of the records provided to the Defendant on that hard drive in my own records. I reviewed those records while preparing this affidavit and confirmed that all records that existed for [T.H.] were included on that hard drive. All documents from Discovery the Defendant references in his 2255 Motion were included on this hard drive at that time as well.

17.     On July 15, 2014, ten days before [T.H.] died, the medical records show that the following medications were prescribed to [T.H.] from the Defendant's office:

a.     Neurontin (Gabapentin) (No dosage in records)
b.     Oxycodone (No dosage in records) (Opioid)
c.     Morphine (No dosage in records) (Opioid)
d.     Promethazine (No dosage in records)

There was a note written in the 3 pages of this visit's notes that stated her "labs" were "ud5-inconsistent (Been in jail a few months)." I confirmed with Grayson County, Texas court records that [T.H.] had been sentenced to 160 days in jail for a Driving While Intoxicated (DWI) case. At that time, I was concerned that the medical records for [T.H.] did not provide a detailed report of her care and other details that would assist us in showing that the opioid medication prescribed were "medically necessary."

18.     Texas Prescription Monitoring Program (TXPMP) records showed that [T.H.] filled four prescriptions that are reported to the TXPMP system on July 15, 2014:

a.     120 units of Alprazolam (Xanax) 1mg
b.     30 units of Zolpidem Tartrate (Ambien) 10mg
c.     60 units of Morphine Sulfate 60mg
d.     120 units of Oxycodone HCL 30 mg

The Texas PMP records showed that [T.H.] filled most of her prescriptions received (medication was consistent over the entire time period of TXPMP records) on the day of her appointments at the Defendant's medical clinic (see dates in paragraph 14, above). I did not see the Xanax or Ambien medications listed in the 7/15/2014 medical records for [T.H.], but they were filled by the same pharmacy at the same time as the Morphine and Oxycodone. According to the TXPMP records, these four prescriptions, in addition to others listed over the months of TXPMP records, were filled at the same time at the same pharmacy on or after each medical visit at the Defendant's clinic.

16

Note:   Neurontin (Gabapentin) is not reported to the TXPMP as it is not currently a federally controlled substance.

19.     After reviewing this medical record for [T.H.], I conducted my own research on the effects of prescribing Neurontin (Gabapentin), Oxycodone, and Morphine at the same time. I located a study dated October 3, 2017 by the National Institute of Health. This study, titled, "Gabapentin, opioids, and the risk of opioid-related death: A population-based nested case-control study" investigated nested case-control records from August 1, 1997 through December 31, 2013 and concluded "In this study we found that among patients receiving prescription opioids, concomitant treatment with gabapentin was associated with a **substantial increase in the risk of opioid-related death**. Clinicians should consider carefully whether to continue prescribing this combination of products and, when the combination is deemed necessary, should closely monitor their patients and adjust opioid dose accordingly." (emphasis added). *See*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5626029/

20.     While spending time trying to locate medical records in previous EMR systems, we also issued almost 2 dozen federal subpoenas for records, including, the Texas Prescription Monitoring Program (PMP) held by the Texas State Board of Pharmacy, the Oklahoma PMP, several police departments involved in the death investigations of the 7 patients in the indictment, and several successor firms of the "Catalis" EMR provider.

21.     Upon review of the records received in response to the federal subpoenas we issued, we were able to show that 6 of the 7 patients listed in the indictment were using multiple doctors both in Texas and Oklahoma and obtaining prescription opioid medication from other doctors besides the Defendant. This severely hampered the government's case in 6 out of the 7 patients listed in the indictment. The only patient listed in the indictment that apparently did not "doctor shop" was [T.H.]. The DEA had not obtained information from Oklahoma as part of their investigation and I believed if we could show an appropriate explanation on the death of [T.H.], this case would be ripe for trial.

22.     In the summer of 2018, Mr. Apgar [co-counsel] and I met with the Defendant and explained our findings. I showed the Defendant the records of [T.H.] and our findings. Unlike the other 6 patients that were seeking medications from multiple doctors, I could find no evidence that [T.H.] was receiving prescriptions from any other medical clinic than the Defendant's office. I told the Defendant that I would speak with AUSA Heather Rattan about our findings and see what the government's final plea offer would be in this case.

23.     Shortly thereafter, after explaining my findings to AUSA Rattan, she offered the Defendant an 11(c)(1)(c) plea agreement for 20 years, the minimum under the statute for a death under 21 USC §846 or 21 USC §841.

24.     Mr. Apgar and I believed that this plea agreement was the best option for the Defendant as we believed under the current "opioid crisis" climate, the Defendant would receive much more than 20 years if he was convicted after trial. Medical records for [T.H.] had been located by us and there were no other older medical records that would change our professional opinion on this case about [T.H.].

25.     Before agreeing to change his plea to guilty, the Defendant continued to complain about locating the missing "hard drive" from the "Catalis" EMR system and wanted it found before accepting a plea. On September 23, 2018, I flew to Richmond, Virginia to attempt to locate the firm that had bought the former company that owned "Catalis." While in Virginia, I confirmed that the company who had bought the company that owned "Catalis" was out of business and spoke to the previous owner at his residence. He confirmed this information to me.

26.     I also flew to Los Angeles, California on or about October 1, 2018 to locate the person the Defendant stated possibly had this missing "hard drive," Mr. Kishor K. Joshi. I found the office address to be abandoned but did locate the home address for Mr. Joshi. I left Mr. Joshi a card and flew back to Dallas. Mr. Joshi called me as I was leaving DFW airport and confirmed to me that he had no knowledge about this "hard drive" and it was not in his possession.

27.     On October 5, 2018, the Defendant appeared in front of Judge Christine Novak and changed [h]is plea to guilty to Counts 1 and 9 of the Superseding Indictment. When asked by Judge Novak if he was satisfied with his attorney's representation, I remember the Defendant stating on the record "more than satisfied."

28.     The Defendant was not sentenced until May 9, 2019 and received the agreed 11(c)(1)(c) plea agreement of 20 years in prison. I had to explain to the Defendant that the minor issues in his PSR that he complained was irrelevant due to the 11(c)(1)(c) agreement and that it would not affect sentencing under the plea agreement.

(Dkt. #35-1, pp. 2-5) (emphasis in original). Counsel then addressed Movant's specific allegations of ineffective assistance:

30.     In Issue number 1, the Defendant claimed that I was "deficient in my pre-trial preparation in regard to Counts 1 and 9," and states that "I failed to

18

investigate witnesses, failed to subpoena treating physician records, requested "PMP" data from the wrong entity, and failed to advance an adversarial challenge to the government's case."

a.    In regard to the allegations of the subpoenas for physician records, these subpoenas were issued, and some information was received, as discussed *supra*,

b.    Regarding the allegations that I subpoenaed "PMP" records from the wrong entity and that I should have subpoenaed the Texas Department of Public Safety, the Defendant is incorrect. On September 1, 2016, the Texas Prescription Monitoring Program (PMP) and included records were completely transferred to the Texas State Board of Pharmacy from the Texas Department of Public Safety. I did receive Texas PMP records from the Board of Pharmacy after I had the Court issue an order to the Board of Pharmacy to comply with the subpoena it was served.

c.    The "adversarial" challenge mounted against the government's case, as discussed *supra*, was extraordinary and resulted in the 20-year 11(c)(1)(c) plea agreement.

31.    In Issue 2, the Defendant made allegations against me that I "misadvised about the elements of the offenses in Counts 1 and 9, lied about the availability of exculpatory evidence, lied about interviewing witnesses, misrepresented that Movant was only pleading guilty to a single death…"

a.    As shown from the evidence provided *supra*, these allegations are simply not true. It was clearly explained to the Defendant that the underlying death he was pleading guilty to, as alleged in Count 1, was the death of [T.H.]. And, due to the plea agreement being a rare 11(c)(1)(c) agreement, it was not worth making an issue about the which "count" the Defendant pleaded guilty. Counts 1-8 all came with the same range of punishment where a death was involved – 20 years to life in prison.

32.    Mr. Apgar and I reluctantly provide this affidavit to protect our reputations from the libelous statements made by the Defendant in his *pro se* filings. We worked very diligently and hard on this case and would not change how we represented the Defendant in this case.

(Dkt. #35-1, pp. 5-6).

19

It is evident that Counsel conducted a thorough investigation of Movant's case, including an exhaustive search of Movant's patients' medical records, and zealously represented Movant during plea negotiations. As discussed more fully below, Movant has failed to demonstrate that Counsel's actions fell outside of an accepted range of professional competence. Count One carried a sentencing exposure of twenty years' to life imprisonment. Counsel negotiated and obtained a plea agreement significantly reducing Movant's potential sentencing exposure on Count One. Instead of risking a sentence of life imprisonment, Movant was the beneficiary of the statutory minimum sentence on Count One—twenty years' imprisonment—and was able to appeal any sentence not imposed in accordance with the plea agreement. "The essence of a plea agreement is that both the prosecution and the defense make concessions to avoid potential losses." *Hughey v. United States*, 495 U.S. 411, 421 (1990); *United States v. Adams*, 363 F.3d 363 (5th Cir. 2004). While Movant gave up his right to trial, he obtained in return the statutory minimum sentence. Movant has not shown, nor does it appear likely, that "but for" Counsel's supposed deficiencies he would have risked trial and the possibility of life imprisonment.

Turning to Movant's specific allegations in his § 2255 amended motion, Movant has failed to establish that Counsel rendered deficient performance with respect to obtaining Movant's patients' medical records. Movant argues that Counsel was ineffective for failing to obtain all of Movant's patients' medical records. Counsel issued numerous subpoenas to the proper entities and received the available medical records. Counsel also spent a considerable amount of time traveling throughout the country trying to locate an alleged missing hard drive containing additional medical records of Movant's patients, but Counsel was unsuccessful in his endeavors. However, to the extent Counsel was not able to obtain all patients' medical records, it was due to Movant's failure to properly maintain his medical records. Indeed, Counsel explained to Movant that poor record-

keeping would hinder his defense. Thus, the record shows that Counsel diligently sought to locate Movant's patients' medical records and was largely successful in doing so. The court finds that Counsel's diligent but unsuccessful effort to locate all of Movant's patients' medical records was not deficient performance.

The court finds that Counsel's investigation into the cause of T.H.'s death was not deficient and that his conclusion not to hire an expert was a strategic decision. The Oklahoma Medical Examiner's Office determined that T.H. died from probable morphine toxicity on July 25, 2014, and the laboratory report identified morphine and butalbital in T.H.'s blood. (Dkt. #50-5, p. 3). The report also detected but did not confirm promethazine in T.H.'s blood. (Dkt. #50-5, p. 3). The report states that the "EIA [enzyme immunoassay] panel does not detect Oxycodone." (Dkt. #50-5, p. 2). In addition, the medical records showed that Movant was the only doctor prescribing opioid medications to T.H. It was a reasonable strategic decision for Counsel not to pursue further investigation nor hire medical experts in light of this evidence. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quoting *Strickland*, 466 U.S. at 690).

Nonetheless, Movant asserts that Counsel should have conducted further investigation into the cause of T.H.'s death and consulted with a medical expert. Movant contends:

> [T]here was a clear appropriate explanation for the death of [T.H.] that [Counsel] overlooked or neglected to investigate. Rather than dying from an overdose of opioids, [T.H.] died from being left in a car by her family in July in Oklahoma in the 100 degree plus temperatures. She really died of hyperthermia, or heat stroke, not an opioid overdose.

(Dkt. #49, p. 16). In support of his argument, Movant points to an email report from Dr. Stacey Hail ("Dr. Hail") to DEA agents that was included in the government's discovery and known to

Counsel in which Dr. Hail opines that because an autopsy was not performed on T.H. and because "[i]t is unclear if the toxicology testing was negative for oxycodone or if the assay does not detect oxycodone,"[4] it was "difficult to ascertain cause of death to fit the 'but for' standard." (Dkt. #50-4, p. 2). Movant also provides an affidavit from Dr. Lindsey Carol Thomas ("Dr. Thomas"), a pathologist contacted by Movant's habeas counsel, opining that it is "highly unlikely" that T.H.'s death was "due to the morphine" and that it is "much more likely that [T.H.'s] death was caused by hyperthermia, which is an abnormally high body temperature." (Dkt. #50-3, p. 5). Dr. Thomas also indicates she "would have been available between 2014 and 2018 to evaluate this case and provide the information in this affidavit" and is "willing to provide testimony concerning this matter." (Dkt. #50-3, p. 5).

Movant asserts that Counsel's failure to consult with Dr. Hail, whose email report was included in the government's discovery and of which Counsel was in possession, and Counsel's failure to consult with Dr. Thomas or any other similar medical expert before accepting the government's claim that the opioids Movant prescribed to T.H. were the cause of her death constituted ineffective assistance. (Dkt. #49, p. 18). Movant urges that Dr. Hail's email report "contradicts the Oklahoma Medical Examiner and is a clear statement that there is no evidence on which to base a conclusion that the opioid prescriptions given to [T.H.] led to her death." (Dkt. #49, pp. 18-20). Dr. Hail's email report does not "contradict" the Oklahoma Medical Examiner report; rather, Dr. Hail simply stated that it was "difficult to ascertain cause of death to fit the 'but for' standard." And Dr. Thomas's affidavit simply provides an alternative cause of T.H.'s death; it does not rule out that T.H. died from morphine toxicity. In short, Dr. Hail's email report and Dr.

---

[4] The Oklahoma Medical Examiner report states that the tests performed included an EIA panel and that the EIA panel does not detect oxycodone. The report does not clearly state that T.H.'s blood tested negative for oxycodone. (Dkt. #50-5, p. 2).

Thomas's affidavit do not alter the court's determination that Counsel's decision not to pursue further investigation and not to hire medical experts in light of the evidence were reasonable strategic decisions.  It should be noted that Movant had access to all of the government's discovery, which included Dr. Hail's email report, yet he still decided to plead guilty. Accordingly, Movant cannot demonstrate that, but for Counsel's failure to consult with experts, he would not have pled guilty and instead would have insisted on going to trial.

Movant also asserts that Counsel was deficient for failing to adequately investigate and gather all of the pertinent medical records to analyze whether Movant's prescriptions were written for a valid medical purpose. (Dkt. #49, p. 24). Again, to the extent Counsel was not able to obtain all patient medical records, it was the fault of Movant for not properly maintaining medical records. Additionally, Movant's medical records for T.H. did not provide a detailed report of her care and other details that would assist Counsel in showing that the opioid medication prescribed were "medically necessary." There was also evidence that pharmacists had concerns about Movant prescribing multiple controlled substances for one patient. Therefore, even if there were evidence indicating Movant issued some prescriptions for medically necessary purposes, there was also evidence to the contrary. Again, the jury would have been tasked with resolving any conflicting evidence, and they could have found, based on the evidence, that Movant wrote and filled

prescriptions for controlled substances without a legitimate medical purpose. Movant cannot demonstrate that, but for Counsel's alleged failure to adequately investigate and analyze whether Movant's prescriptions were written for a valid medical purpose, he would not have pled guilty and instead would have insisted on going to trial.

Movant also asserts that Counsel rendered ineffective assistance with respect to Count Nine, because Counsel failed to investigate his billing to Medicare by consulting with witnesses familiar with the billing procedures of Movant's medical practice. According to Movant, had Counsel conducted an adequate investigation, he would have discovered evidence showing that Movant's mistaken billings to Medicare were just that—mistakes—and not criminal conduct. Movant's conclusory allegations that uncalled witnesses "could prove as an outside third party that there were mistakes in billing [by Movant] but no intent of fraud" (Dkt. #26, p. 12) are unsupported and unsupportable by anything else contained in the record, and therefore they do not raise a constitutional issue. *See Ross*, 694 F.2d at 1011-12.

It is worth repeating that Movant's representations made at his change of plea hearing confirm his plea was knowingly and voluntarily entered and was not the result of Counsel's deficient performance. As previously discussed, at his plea colloquy, Movant admitted to the essential elements of the offenses, agreed that he discussed them with his attorney, agreed with the factual basis included in his plea agreement, agreed that he was satisfied with Counsel's advice and representation, and acknowledged his guilt. Further, the court explained the rights he was giving up when he agreed to plead guilty, including the right to go to trial where he would be able to challenge the facts underlying his charges. Finally, Movant's plea agreement allowed him to greatly limit his sentencing exposure, while being able to appeal any sentence not imposed in accordance with the plea agreement.

Based on the foregoing reasons, the court finds that Movant's claims of ineffective assistance of counsel are without merit and should be denied.

## V.  HEARING

Movant also requests an evidentiary hearing. Evidentiary hearings, however, are not required in federal habeas corpus proceedings. *See Rule 8, Rules Governing § 2255 Cases in the United States District Courts*; *see also McCoy v. Lynaugh*, 874 F.2d 954, 966-67 (5th Cir. 1989). Quite the contrary, "to receive a federal evidentiary hearing, a petitioner must allege facts that, if proved, would entitle him to relief." *Wilson v. Butler*, 825 F.2d 879, 880 (5th Cir. 1987), *cert. denied*, 484 U.S. 1079 (1988). "This requirement avoids wasting federal judicial resources on the trial of frivolous habeas corpus claims." *Id.* In this case, Movant fails to show that he is entitled to an evidentiary hearing. *See United States v. Auten*, 632 F.2d 478, 480 (5th Cir. 1980) (noting that mere conclusory allegations are not sufficient to support a request for an evidentiary hearing). As was determined above, Movant's guilty plea was knowing and voluntary, and he fails to meet his burden in showing that his plea was due to ineffective assistance of counsel. Accordingly, he is not entitled to a hearing.  *See id.*

## VI.  CONCLUSION

The court concludes that Movant's guilty plea was knowing and voluntary. Movant fails to show that Counsel rendered deficient performance or that there is a reasonable probability that, but for Counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694. More specifically, Movant fails to show that, but for Counsel's alleged deficient performance, he would not have pled guilty and instead would have insisted on going to trial. *Hill*, 474 U.S. at 57-59. Additionally, Movant's claims that the government failed to turn over material exculpatory evidence, that the government committed prosecutorial misconduct,

and that 21 U.S.C. § 846 is unconstitutionally vague have been waived and are not cognizable in this proceeding. Finally, Movant fails to show he is entitled to a hearing. For these reasons, the § 2255 amended motion should be denied.

## VII.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a proceeding under § 2255 "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(B). Although Movant has not yet filed a notice of appeal, the court will address whether Movant would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a [movant] relief is in the best position to determine whether the [movant] has made a substantial showing of a denial of a constitutional right on the issues before the court.  Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected constitutional claims on the merits, the movant must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). When a district court denies a motion on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue when the movant shows, at least, that jurists of reason would find it debatable whether the motion states a

valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*

In this case, it is respectfully recommended reasonable jurists could not debate the denial of Movant's § 2255 motion on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is recommended the court find Movant is not entitled to a certificate of appealability.

## VIII.  RECOMMENDATION

It is recommended the above-styled motion for relief under 28 U.S.C. § 2255 be denied and this case be dismissed with prejudice. It is further recommended a certificate of appealability be denied.

Within fourteen days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*,

79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superceded by statute on other grounds*, 28 U.S.C.

§ 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 3rd day of September, 2023.**

AILEEN GOLDMAN DURRETT
UNITED STATES MAGISTRATE JUDGE